UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
VICTORIA SYMOTYUK-KNOLL,

                                                **Civil Action No.: 21-cv-8348**

                  Plaintiff,          **<u>COMPLAINT</u>**

       -against-

                                              ***Jury Trial Demanded***

HEALTHEQUITY, INC. and
WAGEWORKS, INC.,

                 Defendants.
--------------------------------------------------------X

      PLAINTIFF VICTORIA SYMOTYUK-KNOLL, by her attorney Goddard Law PLLC, whose offices are located at 39 Broadway, Suite 1540, New York, NY 10006, alleges upon knowledge with respect to herself, and upon information and belief as to all other matters, as follows:

<h2 style="text-align:center"><u>NATURE OF THE ACTION</u></h2>

      1.      This is civil action brought on behalf of Plaintiff Victoria Symotyuk-Knoll, against Defendants HealthEquity, Inc. and WageWorks, Inc. for gender and pregancy discrimination and retaliation in violation of Title VII; for gender, pregnancy, and age discrimination and retaliation in violation of the New York State Human Rights Law and the New York City Human Rights Law; and for retaliation and interference with Plaintiff's rights under the Family and Medical Leave Act, together with any and all other causes of action which can be reasonably inferred from the facts as set forth below.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over Plaintiff's claims under Title VII of the 1964 Civil Rights Act, 42 U.S.C § 2000, *et seq.* ("Title VII") and the Familiy and Medical Leave Act, 29 U.S.C. § 2601, *et seq.* ("FMLA")

3.      The Court has supplemental jurisdiction over Plaintiff's state and city law claims, specifically the New York State Human Rights Law, NYS Executive Law § 296, *et seq.* ("NYSHRL" or "New York State Human Rights Law") and the New York City Human Rights Law, Administrative Code of the City of New York § 8-101, *et seq.* ("NYCHRL" or "New York City Human Rights Law") pursuant to 28 U.S.C. § 1367.

4.      Venue is proper in this Court, pursuant to 28 U.S.C. § 1391(b)(2), because this is the judicial district in which a substantial part of the events or omissions giving rise to the claim occurred.

## PROCEDURAL REQUIREMENTS

5.      Plaintiff filed a charge of unlawful discriminatory practice relating to employment because of sex, pregnancy, and retaliation with the Equal Employment Opportunity Commission ("EEOC") on March 12, 2021.  By notice dated July 20, 2021, the EEOC issued a Notice of Right to Sue against Defendand HealthEquity, Inc. and Defendant WageWorks, Inc. A copy of the notices are attached to this Complaint as **Exhibit 1**.  The Complaint in this matter was filed within 90 days of Plaintiff's receipt of the Right to Sue Letters.

## PARTIES

6.      Plaintiff Victoria Symotyuk-Knoll ("Plaintiff") is a female who resided in New York, New York at all relevant times. Plaintiff was subject to sex, pregnancy and age discrimination and retaliation at HealthEquity, Inc. and WageWorks, Inc.

7.      Plaintiff was, at all times relevant herein, Defendants' "employee" within the

2

meaning of all relevant federal, state and local laws, including, but not limited to, Title VII.

8.      Upon information and belief, at all times herein, Defendant HealthEquity, Inc. ("Defendant HealthEquity") was and is a corporation registered to do business in New York. Upon information and belief, Defendant HealthEquity's national headquarters is located at 15 W. Scenic Pointe Drive, Ste. 100, Draper, Utah 84020 and it also operates out of 36 W. 44th St. Suite 1202, New York, New York 10036. Plaintiff worked out of Defendant HealthEquity's New York office.

9.      Upon information and belief, at all times herein, Defendant WageWorks, Inc. ("Defendant WageWorks") was a corporation registered to do business in New York with headquarters at 1100 Park Place, 4th Floor, San Mateo, California 94403.

10.     Upon information and belief, Defendant HealthEquity, Inc. acquired WageWorks, Inc. in 2019.

11.     Upon information and belief Defendant HealthEquity, Inc. and Defendant WageWorks, Inc. had at least 50 employees at all relevant times.

12.     Defendant HealthEquity, Inc. and Defendant WageWorks, Inc. will collectively be referred to as "Defendants."

13.     Defendants were, at all times relevant herein, Plaintiff's "employer" within the meaning of all relevant federal, state and local laws, including but not limited to, Title VII.

## FACTUAL BACKGROUND

### *Plaintiff Has a Successful Accounting Career*
### *with Defendant WageWorks's Predecessor Companies*

14.     In or about February of 2008, a headhunter placed Plaintiff to fill a temporary accountant position in the Finance Department at TransitCenter – a company that provided pre-tax commuter transit benefits to employees – in New York, New York.

3

15.     Because the Chief Financial Officer and Controller at the time thought very highly of Plaintiff's work, she was soon offered a permanent position with TransitCenter in March of 2008.

16.     Plaintiff flourished as an accountant with TransitCenter and had good working relationship with her colleagues in the company's Finance Department.

17.     In 2009, upon information and belief, TransitCenter's Finance Department employed approximately eight individuals, including Controller Erica Mathis, the Chief Financial Officer David Schwartz ("CFO Schwartz"), a director, a financial analyst, two senior accountants, and two accountants.

18.     Plaintiff reported directly to CFO David Schwartz at the time.

19.     In or around 2012, Defendant WageWorks – a company which administered consumer-directed benefits, including pre-tax spending accounts, like Health Savings Accounts, Flexible Spending Accounts, Health Reimbursement Arrangements – acquired TransitCenter and added commuter benefits to its repertoire of benefits offered to companies and employees.

20.     As a result of the acquisition, TransitCenter's name changed to TransitChek and TransitChek became a division of Defendant WageWorks.

21.     While there was a shift in work culture as a result of the acquisition, Plaintiff continued as an accountant for Defendant WageWorks in the Finance Department of TransitChek out of the New York office.  Plaintiff continued to work diligently as an accountant with essentially the same core team.

### *Defendant WageWorks Transitions TransitChek to Remote Work*

22.     Upon information and belief, in or around 2016, Defendant WageWorks started to transition employees, including the Finance Department of TransitChek, to remote work.  Soon the entire TransitCheck Finance Department began to work remotely.

23.     Soon after the team transitioned to remote work, in or around 2016, Defendant WageWorks eliminated CFO Schwartz's and one other senior accountant's positions.

24.     As result, Controller Mathis became Plaintiff's direct supervisor.   Plaintiff continued to work diligently and successfully for the company for several years.

25.     At some point during the time that the TransitChek Finance Department went remote, Defendant WageWorks acquired another company and another female accountant, Sharon Farmsworth ("Accountant Farmsworth"), became part of the Finance Department of TransitChek.[1]

### *Plaintiff Learns that She Is Pregnant*

26.     In or around June 2019, Plaintiff, who was approximately fifty years old at the time, learned that she was pregnant.

27.     While Plaintiff was overjoyed with the news, her pregnancy was high risk for a variety of reasons, including her age.

28.     After consulting with her specialist, Plaintiff thought it best not to disclose her pregnancy to others, including her employer, until she was approximately seven months pregnant because of the very real uncertainty that she would reach a viable term of pregnancy.

---

[1]  Upon information and belief, Controller Mathis also supervised two women out of Defendant WageWorks's California office for a short time period.

### *Defendant HealthEquity Acquires Defendant WageWorks*

29.     In or around the end of August or early September 2019, it became public that Defendant HealthEquity – a company that administers health savings accounts (HSAs) and other consumer directed benefits – acquired Defendant WageWorks.  Upon information and belief, Defendant WageWorks was to be integrated and merged into Defendant HealthEquity.

30.     Because Plaintiff had been through the Defendant WageWorks acquisition successfully, Plaintiff hoped that her hard work as an accountant was valued and that she would be part of a successful transition.

### *Defendant HealthEquity Gives Plaintiff a*
### *Significant Retention Bonus Because She is a Valued Employee*

31.     On or around September 3, 2019, the Corporate Controller of Defendant WageWorks, Jennifer Shue ("Corporate Controller Shue") placed a calendar meeting on Plaintiff's calendar.  Plaintiff was a bit nervous about the call because of the news of the acquisition.

32.     On the call, Plaintiff was pleasantly surprised when Corporate Controller Shue said to Plaintiff, "I know that you are doing good work."  She then explained Defendant HealthEquity wanted to give her a retention bonus for $20,069.00, approximately 25% of her annual salary, because they wanted to ensure to keep an employee like her who has longstanding company knowledge and skills and did not want her to leave the company.

33.     Plaintiff received a $20,069.00 retention bonus on or around March 2020. Upon information and belief, Defendant would not have given her a retention bonus if they knew that she was pregnant.

34.     Upon information and belief, at the time, Defendants – who did not know Plaintiff was pregnant – had every intention of retaining Plaintiff following the merger.

### *VP Murdock Introduces Himself to New York Finance Department*

35.     Approximately one to two months after the acquisition, Controller Mathis invited the TransitChek Finance Team to an introductory Zoom call with the Vice President of Finance for Defendant HealthEquity, Tyson Murdock ("VP Murdock").

36.     Plaintiff and other members of the Finance Department attended the Zoom call where VP Murdock introduced himself and also complimented the department on its performance. VP Murdock also asked all the team members to introduce themselves to him by explaining their job duties and longevity with the company.

37.     During the Zoom call, VP Murdock assured the team that there would be a smooth transition and essentially conveyed that they should feel confident that there was job security.  He also told the finance team to feel free to reach out to him directly with any questions.

### *Plaintiff Informs Controller Mathis of Her Pregnancy*

38.     In or around November 2019, when Plaintiff was approximately six months pregnant and had reached a viable term of pregnancy, she contacted Controller Mathis and asked her if she could spare a few minutes to speak with her by phone.

39.     On their call, Plaintiff informed Controller Mathis that she would need to go out on FMLA leave in February 2020.

40.     Plaintiff understood that she was entitled to three months leave as she had previously taken leave in 2017 for a scheduled surgery. Plaintiff had returned from leave only after two months in 2017 on the condition that she be able to attend regular physical therapy appointments, but because she was unable due to Controller Mathis' negative comments when she tried to schedule the appointments, she ended up needing two additional weeks of FMLA leave.

41.     In response to her request, shockingly, Controller Mathis coldly lectured Plaintiff that "February was not the time to go out on a planned procedure" because the company was going through a merger and the company's year-end was January 31, 2020, meaning that February 2020 would be extremely busy for the Finance Team.

42.     Taken aback by Controller Mathis's negative reaction to her leave request, Plaintiff explained to Controller Mathis that she could not take leave at another time because she was pregnant.

43.     Upon information and belief, because of Plaintiff's age, Controller Mathis was stunned by the news.  Controller Mathis mumbled a shocked and brief congratulations to Plaintiff and then oddly launched into a diatribe about her own difficulties with daycare.

44.     Controller Mathis told Plaintiff to immediately coordinate with Human Resources about her leave to get the ball rolling.

45.     Plaintiff, who was still anxious and nervous about her pregnancy, conveyed to Controller Mathis that she did not want to advertise her pregnancy because she was high risk and that she did not plan to tell anyone who did not need to know, but that she would of course follow up with Human Resources.

46.     Plaintiff was particularly surprised by Controller Mathis' negative reaction to her pregnancy news and request for FMLA leave because Plaintiff knew that Controller Mathis had children. Even though, upon information and belief, Controller Mathis' children were high-school and middle-school age and she had not needed FMLA leave while employed by Defendants, Plaintiff expected that she would understand Plaintiff's need for FMLA leave.

47.     Upon information and belief, because of Plaintiff's age, Controller Mathis had made assumptions about her familial and/or parental responsibilities and had assumed that Plaintiff would not be having a child at this time in her life.

48.     Controller Mathis's reaction caused Plaintiff great concern about her job security.

### Controller Mathis Criticizes Plaintiff for
### Not Telling Her Sooner About Her Pregnancy

49.     A few weeks later, Controller Mathis and Plaintiff were having a conversation via telephone about a work-related matter.  To Plaintiff's utter surprise, Controller Mathis interrupted their conversation to reprimand Plaintiff for not announcing her pregnancy as soon as she knew she was pregnant and making it clear that she felt it was unprofessional to withhold pregnancy information.

50.     Plaintiff was forced to explain that her doctors had advised against her sharing the information since her pregnancy was so high risk.

### Defendants Begin to Retaliate Against Plaintiff

51.     Around this time, while Plaintiff was preparing for her leave to make sure no tasks were missed while she was away, all of Plaintiff's colleagues within her department began to train on a system regarding card reconciliation and fraud prevention, including Accountant Farmsworth.

52.     Despite knowing that Plaintiff would not be out for FMLA leave for several weeks and that she would be returning to her positon once her leave ended, Defendants singled out Plaintiff and did not train her on the card reconciliation and fraud prevention system while training everyone else, including her non-pregnant counterpart, Accountant Farmsworth.

53.     At the time, Plaintiff assumed that Defendant was not training her on the card reconciliation and fraud prevention program because she would be on FMLA leave shortly, and that she would be trained upon her return.

9

***Plaintiff Requests Paid Time Off***
***<u>Right Before Due Date and Controller Does Not Approve All Days</u>***

54.     In or around early January 2020, upon information and belief, Plaintiff requested three days of Paid Time Off ("PTO") right before her February 9, 2020 due date, in case she went into labor.

55.     Plaintiff was trainging other employees in preparation for her leave and knew they would be trained well in advance of the requested PTO, so the additional three days would not cause any problems with coverage of Plaintiff's duties.

56.     In response to Plaintiff's scheduled request, Controller Mathis shockingly refused to approve all three days and chastised Plaintiff for asking, before "allowing" her to only take two of the three days off. On information and belief, Controller Mathis regularly approved non-pregnant employees' PTO requests, particularly if they were made in advance.

***<u>Plaintiff Contacts VP Murdock and Informs Him She Is Pregnant</u>***

57.     In or around the end of December 2019 or early January 2020, VP Murdock reconnected with the finance team in New York and invited them to an optional team dinner at a restaurant when he was going to be in New York City for an investor meeting.

58.     Because it was flu season and Plaintiff had a high-risk pregnancy, she did not attend. Upon information and belief, none of her colleagues on the TransitChek Finance Department attended except for Controller Mathis.

59.     Plaintiff – who was becoming more worried about the security of her job because of her pregnancy and upcoming maternity leave based on Controller Mathis's comments to–and anger at–her – took VP Murdock up on his offer to contact him with any questions.

60.     Upon information and belief, in or around late January 2020, Plaintiff requested and was granted a call with VP Murdock. Plaintiff explained that she had been working as an

accountant for the company for a long time, and that she was wondering if there might be a change in the Finance Department in New York due to the merger.  She explained that she was expecting her first child and that she was going out on maternity leave in February 2020. She said, "I'm worried a bit about job security because I'm going on leave and just do not know what to expect. I don't know if I should be worried about my position while I'm out."

61.     VP Murdock responded, "Don't worry.  I have children myself.  Go have the baby and that's important and take care of the child."

62.     Plaintiff also offered to use intermittent leave to get back to work faster.  VP Murdock endorsed the idea and wished her "good luck."

### *Plaintiff Trains Her Colleagues on Her Responsibilities*

63.     Around that time, Controller Mathis asked Plaintiff to develop a plan for training the Finance Team on her responsibilities while she was out on maternity leave and of course, Plaintiff had already been doing so.  Upon information and belief, Defendants intended to segue all of Plaintiff's work because they intended to terminate her after her leave.

64.     In or around January through early February 2020, Plaintiff ensured that her colleagues were properly trained to take on her job duties while she would be out on maternity leave.

### *Plaintiff Is Afraid to Request Time Off After Falling Due to Mathis' Comments*

65.     On or around February 2, 2020, Plaintiff fell hard on the street.  Plaintiff was nine months pregnant at the time, and about one week away from her due date.  Plaintiff contacted her doctor, who suggested that Plaintiff get a sonogram.

66.     Plaintiff, whose busiest days of the month fell on the first two business days of the month, was too scared to ask Controller Mathis for time off to get a sonogram because, in January,

11

Controller Mathis had already been angry about her request to schedule PTO days, and would certainly not approve a last minute request when she did not fully approve one requested weeks in advance.

67.     Later on that day, Plaintiff confided in Accounting Manager Joyce Berry that she had fallen hard onto the sidewalk on Sunday and needed a sonogram but was scared to ask for time off.  Account Manager Joyce Berry encouraged her to ask for the time off to go to the doctor.

68.     Plaintiff called Controller Mathis and told her what had happened.  In an aggravated tone, Controller Mathis snapped, "Why didn't you tell me from the beginning?  Do you think we weren't going to understand?"  Plaintiff truthfully explained that she was afraid that Controller Mathis would not give her the time.  Having no other choice given the circumstances, Controller Mathis approved time off for Plaintiff to obtain a sonogram, but as had been the case throughout her pregnancy regarding any time off, she was clearly annoyed.

### ***Plaintiff Goes Out on Leave and Has a Baby Girl***

69.     On or around February 10, 2020, Plaintiff went out on leave.

70.     Plaintiff had a baby girl on February 11, 2020.

71.     On or around five days later, her new baby girl ended up in the emergency room with a medical emergency, which was extremely frightening given Plaintiff's high-risk pregnancy. Thankfully, Plaintiff's newborn was released the next day.

72.     Plaintiff was out of work on maternity leave until May 4, 2020. The leave was FMLA protected.

73.     As highlighted below, during the course of her leave, Plaintiff was in regular communication with Defendants' Human Resources, the insurance carrier, and Controller Mathis about her leave and her return to work.

***Plaintiff Decided to Return to Work and to
Use Additional Leave Intermittently Because She Feared for Her Job***

74.     Plaintiff, who had additional days of leave that could be used intermittently, decided to return to work on May 5 because she was worried about her job, so, she felt she had to use her additional days as intermittend leave and spread them out through May and June by working 3 days and taking two days of leave on a weekly basis, with one week of her taking four days of leave.

75.     Plaintiff communicated with Defendants' Human Resources and insurance carrier about her return to work, the additional leave she was entitled to, and her return to work schedule. Plaintiff emailed her schedule to Defendants' Human Resources and to the insurance carrier.

76.     On or about March 27, 2020, Plaintiff communicated with Controller Mathis informing her that her FMLA leave ended on May 3, 2020, and explained that it was determined by Defendants' Human Resources and the insurance carrier that she was entitled to additional leave (20 work days) to bond with her child which could be take intermittently.  She also reminded Controller Mathis that they previously had discussed Plaintiff's banked PTO, and that she planned to take those days in June and July, and that she would notify Controller Mathis of the exact dates.

77.     On April 2, 2020, Plaintiff followed up with Controller Mathis and attached a spreadsheet of her leave for the intermittent days that she had sent to Human Resources and the insurance carrier, as well as the request for PTO (accumulated time off) that required Controller Mathis's approval.

78.     That same day, Controller Mathis responded coldly, ignoring her intermittent leave request, and told her that she would have to get back to Plaintiff about the PTO "to make sure it aligns with the rest of the team and get back to [her]."  She added, "[the PTO] will probably be in a few weeks due to deliverables that have to get out."

79.     Controller Mathis never formally approved Plaitniff's intermittent FMLA leave or request for PTO days.

80.     Upon information and belief, Controller Mathis and Defendants were infuriated that Plaintiff, after not telling them she was pregnant "soon" enough and taking FMLA leave, now also wanted to utilize intermittent leave and her accumulated PTO to care for her child-even though she was entitled to such time off.

81.     Upon information and belief, Defendants expected and wanted Plaintiff to return full time on May 5, 2020, despite having additional FMLA leave and Defendants viewed Plaintiff in a negative light because she sought to use her full (through intermintent leave days) leave and paid time off benefits.

***Plaintiff Returns and Controller Mathis***
***Takes Away Her Responsibilities Except for Accounts Receivables***

82.     On or around May 5, 2020, Plaintiff returned to work. Plaintiff asked a colleague whether she should take care of the bank report, and was told "don't worry about it, speak to [Controller Mathis]."

83.     When Plaintiff spoke to Controller Mathis, Controller Mathis told her that account receivables were in "bad shape" and that was the only job responsibility she needed to worry about. Controller Mathis angrily added, "It's hard to keep track of the days you are out," referring to Plaintiff's intermittent leave.

84.     Plaintiff was taken aback because she had provided the dates to Controller Mathis well in advance. Therefore, Plaintiff delicately offered to put the dates on the team calendar. Controller Mathis dismissed her and told her that that calendar was not being used by the team. She then coldly said, "Just focus on accounts receivables. Everything else you don't have to do. Other people are taking care of your other responsibilities."

85.     On information and belief, Controller Mathis had given away many of Plaintiff's responsibilities to Accountant Farmsworth even after Plaintiff's return in preparation to terminate Plaintiff's employment.

86.     On information and belief, before and during the time Plaintiff was on FMLA leave, Defendants elimated Accountant Farmsworth's duties and Controller intentionally gave her Plaintiff's duties in an attempt to retain Account Farmsworth, who had not been pregnant nor went on leave, and terminate Plaintiff based on not having a need for her anymore.

87.     In addition to giving Accountant Farmsworth Plaintiff's duties, Accountant Farmsworth was trained on the card reconciliation and fraud prevention systems and Plaintiff was not because Defendants did not let Plaintiff train prior to her leave, when all the other employees trained. On information and belief, Defendants did not train Plaintiff prior to her leave so they could say that Accountant Farmsworth was more necessary to the business than Plaintiff upon her return from FMLA leave, proving an excuse to terminate Plaintiff's employment.

### *Defendants Unlawfully Terminate Plaintiff*

88.     On May 19, 2020 – only about two weeks after her return from maternity leave and while she was still using intermittent FMLA leave – Plaintiff was unexpectedly invited to a telephonic meeting about retention of employment from a representative of Defendants' Human Resources.

89.     Plaintiff thought that the call was possibly to discuss the specifics relating to her return. When Plaintiff called in, the human resources representative, Ashely Bird, ("Representative Bird") and Controller Mathis were on the line.  Shockingly, Representative Bird informed her that she was being laid off, and disingenuously claimed that there had been a reduction in workforce due to Covid.

90.     Plaintiff, however, knew that Defendants had actually terminated her because of pregnancy, maternity leave, use of leave that she was entitled to, and her age.

91.     In fact, upon information and belief, no one from Defendants' TransitChek Finance Department was let go around that time except for Plaintiff – an older woman who just returned to work on intermittent leave with caregiving responsibilities for a newborn baby. Defendants had actually retained Accountant Farmworth after training her on Plaintiff's resposbilities and despite the fact, on information and belief, Accountant Farmworth's duties had been elimated months before Plaintiff returned from her FLMA protected leave.

92.     Defendants terminated Plaintiff while she was still using her intermittent FMLA leave days.

93.     Based on Defendants' actions Plaintiff has suffered severe emotional distress and economic damages.

94.     Plaintiff suffers from severe enxiety, distruption in her sleep schedule and low self esteem because of Defendants' conduct.

## AS AND FOR THE FIRST CAUSE OF ACTION
*Discrimination under Title VII*
*(against Corporate Defendants)*

95.     Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

96.     Defendants have discriminated against Plaintiff on the basis of her gender and pregnancy in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, *et seq.,* as amended by the Civil Rights Act of 1991. Plaintiff has suffered disparate treatment as a result of Defendants' wrongful conduct.

97.     Defendants have discriminated against Plaintiff by treating her differently from

16

and less preferably than similarly-situated male and non-pregnant employees and by subjecting her to severe and pervasive harassment, a hostile work environment, discriminatory denial of promotions, discriminatory termination, disparate terms and conditions of employment on the basis of her sex and pregnancy.

98.     Defendants conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Plaintiff, entitling Plaintiff to punitive damages.

99.     By reason of Defendants' discrimination, Plaintiff is entitled to all remedies available for violations of Title VII.

## AS AND FOR THE SECOND CAUSE OF ACTION
*Retaliation in Violation of Title VII*
*(against Corporate Defendants)*

100.     Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

101.     Plaintiff repeatedly objected to and reported to Defendants about Defendants' discriminatory treatment of her.

102.     In retaliation, Defendants subjected Plaintiff to a series of adverse employment actions including, but not limited to, preventing Plaintiff from performing the duties of her position and a termination of Plaintiff's employment in violation of Title VII.

103.     Defendants' conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Plaintiff.

104.     As a result of Defendants' conduct alleged in this Complaint, Plaintiff has suffered and continues to suffer harm, including but not limited to lost earnings, lost benefits, other financial loss, and non-economic damages.

105.     By reason of Defendants' retaliation, Plaintiff is entitled to all remedies available

for violations of Title VII.

## AS AND FOR THE THIRD CAUSE OF ACTION
*Gender, Pregnancy, and Age Discrimination in Violation of New York State Human Rights Law*
*(Against All Defendants)*

106.     Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

107.     Defendants have discriminated against Plaintiff on the basis of her gender, pregnancy, and age in violation of the New York State Human Rights Law, New York State Executive Law § 296, *et seq.* Plaintiff has suffered and disparate treatment as a result of Defendants' wrongful conduct.

108.     Defendants have discriminated against Plaintiff by treating her differently from and less preferably than similarly-situated younger male and non-pregnant employees and by subjecting her to severe and pervasive harassment, a hostile work environment, discriminatory denial of promotions, discriminatory termination, disparate terms and conditions of employment on the basis of her sex, pregnancy and age.

109.     Defendants' conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Plaintiff, entitling Plaintiff to punitive damages.

110.     By reason of Defendants' discrimination, Plaintiff is entitled to all remedies available for violations of the New York State Human Rights Law. Plaintiff shall seek attorney's fees and punitive damages.

## AS AND FOR THE FOURTH CAUSE OF ACTION
*Retaliation in Violation of the New York State Human Rights Law*
*(Against All Defendants)*

111.      Plaintiff re-alleges and incorporates by reference each and every allegation in

18

each and every aforementioned paragraph as if fully set forth herein.

112.    Plaintiff repeatedly objected to and reported to Defendants about Defendants' discriminatory treatment of her.

113.    In retaliation, Defendants subjected Plaintiff to a series of adverse employment actions including, but not limited to, preventing Plaintiff from performing the duties of her position and a termination of Plaintiff's employment in violation of the New York City Human Rights Law.

114.    Defendants' conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Plaintiff.

115.    As a result of Defendants' conduct alleged in this Complaint, Plaintiff has suffered and continues to suffer harm, including but not limited to lost earnings, lost benefits, other financial loss, and non-economic damages.

116.    By reason of Defendants' retaliation, Plaintiff is entitled to all remedies available for violations of the New York Human Rights Law. Plaintiff shall seek attorney's fees and punitive damages.

## AS AND FOR THE FIFTH CAUSE OF ACTION
*Gender, Pregnancy and Age Discrimination in Violation of the*
*New York City Human Rights Law*
*(Against All Defendants)*

117.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

118.    Defendants have discriminated against Plaintiff on the basis of her gender, pregnancy and age in violation of the New York City Human Rights Law, the Administrative Code of the City of New York § 8-101, *et seq.* Plaintiff has suffered and disparate treatment as a result of Defendants' wrongful conduct.

119.    Defendants have discriminated against Plaintiff by treating her differently from

and less preferably than similarly-situated younger male and non-pregnant and employees and by subjecting her to severe and pervasive harassment, a hostile work environment, discriminatory denial of promotions, discriminatory termination, disparate terms and conditions of employment on the basis of her sex, pregnancy, and age.

120.     Defendants' conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Plaintiff, entitling Plaintiff to punitive damages.

121.     By reason of Defendants' discrimination, Plaintiff is entitled to all remedies available for violations of the New York City Human Rights Law. Plaintiff shall seek attorney's fees and punitive damages.

<u>**AS AND FOR THE SIXTH CAUSE OF ACTION**</u>
*Retaliation in Violation of the New York City Human Rights Law*
*(Against All Defendants)*

122.      Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

123.     Plaintiff repeatedly objected to and reported to Defendants about Defendants' discriminatory treatment of her.

124.     In retaliation, Defendants subjected Plaintiff to a series of adverse employment actions including, but not limited to, preventing Plaintiff from performing the duties of her position and a termination of Plaintiff's employment in violation of the New York City Human Rights Law.

125.     Defendants' conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Plaintiff.

126.     As a result of Defendants' conduct alleged in this Complaint, Plaintiff has suffered and continues to suffer harm, including but not limited to lost earnings, lost benefits, other

20

financial loss, and non-economic damages.

127.    By reason of Defendants's discrimination, Plaintiff is entitled to all remedies available for violations of the New York City Human Rights Law. Plaintiff shall seek attorney's fees and punitive damages.

### AS AND FOR THE SIXTH CAUSE OF ACTION
*Interference With Rights Under the Family and Medical Leave Act*
*(Against Corporate Defendants)*

128.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

129.    Section 2612(a)(1)(A) of the FMLA, states in pertinent part:

> an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period . . . Because of the birth of a son or daughter of the employee and in order to care for such son or daughter.

130.    Section 2615(a) of the Family Medical Leave Act, states in pertinent part:

> Interference with rights. (1) Exercise of rights. It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter…

131.    Defendants violated these sections as set forth herein.

132.    Despite Defendants' knowledge of Plaintiff's need for FMLA leave and intermittent leave, Defendants interfered with Plaintiff's rights by pressuring her to return early from leave and terminating her while on intermittent leave.

133.    Defendants had no good faith business justification for any of the actions taken against Plaintiff as alleged herein.

134.    As a result of Defendants' actions, Plaintiff was extremely humiliated, degraded, embarrassed, and emotionally distressed.

135.    As a result of the acts and conduct complained of herein, Plaintiff suffered a

loss of income, loss of employment, loss of retirement benefits, the loss of a salary/pay, special

damages, loss of benefits, other compensation which Plaintiff's employment included, and

Plaintiff has also suffered emotional pain, suffering, inconvenience, loss of enjoyment of life,

and other non-pecuniary losses.

136.    Defendants' conduct has been malicious, willful, outrageous, and conducted

with full knowledge of the law.

137.    Plaintiff is entitled to the maximum damages allowable under this law.

### AS AND FOR THE SIXTH CAUSE OF ACTION
*Interference With Rights Under the Family and Medical Leave Act*
*(Against Corporate Defendants)*

138.    Plaintiff re-alleges and incorporates by reference each and every allegation in

each and every aforementioned paragraph as if fully set forth herein.

139.    Section 2614(a) of the Family Medical Leave Act, states in pertinent part:

(1) In general. Except as provided in subsection (b), any eligible employee who
takes leave under section 102 for the intended purpose of the leave shall be
entitled, on return from such leave: (A) to be restored by the employer to the
position of employment held by the employee when the leave commenced; or (B)
to be restored to an equivalent position with equivalent employment benefits, pay,
and other terms and conditions of employment.

140.    Section 2615(a) of the Family Medical Leave Act, states in pertinent part:

Interference with rights…Discrimination. It shall be unlawful for any
employer to discharge or in any other manner discriminate against
any individual for opposing any practice made unlawful by this
subchapter.

141.    Defendants violated these sections as set forth herein.

142.    Upon information and belief, Defendants retaliated against Plaintiff for taking

FMLA leave related to the birth of her child by pressuring her to return early, not formally

approving her intermittent FMLA leave request, and ultimately terminating her employment while

still on intermittent leave.

143. Defendants had no good faith business justification for any of the actions taken against Plaintiff as alleged herein.

144. As a result of Defendants' actions, Plaintiff was extremely humiliated, degraded, embarrassed, and emotionally distressed.

145. As a result of the acts and conduct complained of herein, Plaintiff suffered a loss of income, loss of employment, loss of retirement benefits, the loss of a salary/pay, special damages, loss of benefits, other compensation which Cintron's employment included, and Plaintiff has also suffered emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

146. Defendants' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law.

147. Plaintiff is entitled to the maximum damages allowable under this law.

### RELIEF

**WHEREFORE**, for the foregoing reasons, Plaintiff demands judgment against Defendants, for all compensatory, liquidated, emotional, physical, and punitive damages, lost pay, front pay, injunctive relief, and any other relief to which the Plaintiff is entitled. It is specifically requested that this Court grant judgment in favor of Plaintiff as follows:

(a) Declaring that by the acts and practices complained of herein, Defendants has violated Title VII, New York State Human Rights Law, New York City Human Rights Law, and the FMLA;

(b)    Directing Defendants to take such affirmative action as is necessary to ensure that the effects of these violations are eliminated and do not continue to affect Plaintiff's employment opportunities;

(c)    Directing Defendants to make Plaintiff whole for all earnings she would have received but for Defendants's discriminatory and retaliatory treatment, including but not limited to, lost wages, pension, and other benefits;

(d)    Directing Defendants to pay Plaintiff liquidated damages for interfering with her rights under the FMLA;

(e)    Directing Defendants to pay Plaintiff compensatory damages for her mental anguish, emotional distress, and humiliation;

(f)    Awarding Plaintiff punitive damages as relates to the malicious and willful conduct of Defendants;

(g)    Awarding Plaintiff pre- and post-judgment interest;

(h)    Awarding Plaintiff costs and reasonable attorneys' fees; and

(i)    Granting Plaintiff such other and further relief as this Court deems necessary and proper.

Dated: New York, New York
       October 8, 2021                 Respectfully submitted,

                                   GODDARD LAW PLLC
                                   *Attorney for Plaintiff*

                                 By: */s/ Megan S. Goddard*
                                    Megan S. Goddard, Esq.
                                    Siobhan Klassen, Esq.
                                 39 Broadway, Suite 1540
                               New York, NY 10006
                               Office: 646-504-8363
                               Fax: 212-473-8705
                               Megan@goddardlawnyc.com
                               Siobhan@goddardlawnyc.com